IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE STATE OF ALABAMA, ) <br> DEPARTMENT OF REVENUE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FEDERAL DEPOSIT INSURANCE ) <br> CORPORATION, as Receiver for ) <br> Colonial Bank, and BRANCH ) <br> BANKING AND TRUST COMPANY, ) <br> as Successor in Interest to COLONIAL ) <br> BANK, ) <br> ) <br> Defendants. ) | Case No. 2:11-cv-272-MEF <br> (WO—Publish) |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This cause comes before the Court on Branch Banking and Trust's (BB&T) Motion to Dismiss (Doc. # 8). The Alabama Department of Revenue (ADOR) initially brought suit against the Federal Deposit Insurance Corporation (FDIC) and BB&T for the payment of taxes incurred by Colonial Bank and its various affiliates, claiming that both the FDIC and BB&T were successors to the failed bank's liabilities. BB&T now moves to dismiss, contending that the Purchase and Assumption Agreement it entered into with the FDIC does not contemplate BB&T owing the ADOR for back taxes owed by Colonial Bank and its affiliates. After careful consideration of the arguments of

1

counsel and the relevant law, the Court finds that BB&T's motion is due to be GRANTED and the complaint DISMISSED without prejudice.

## II. JURISDICTION AND VENUE

The Court has subject matter over this case under 12 U.S.C § 1821(d)(6)(A) (allowing judicial determination of claim on deposit insurance fund). The parties do not contend that the Court lacks personal jurisdiction over them, nor do they dispute that venue is proper.

## III. LEGAL STANDARD

A motion to dismiss mainly tests the legal sufficiency of the complaint. Fed. R. Civ. P. 12(b)(6). It does not delve into disputes over the proof of the facts alleged—such a crucible is reserved for the summary judgment stage. With this in mind, the Court accepts as true all well-pled factual allegations in the complaint, viewing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). And while a court typically keeps its motion to dismiss inquiry within the four corners of the complaint, the Court may nonetheless consider an outside document when it is undisputed and central to the plaintiff's claims. *Speaker v. U.S. Dep't of Health & Human Servs.*, 623 F.3d 1371, 1379–80 (11th Cir. 2010). The Court will grant a motion to dismiss "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall Cnty. Bd. of Ed. v. Marshall Cnty.*

*Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

A motion to dismiss also requires compliance with some minimal pleading standards. Indeed, although a plaintiff's complaint generally need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), the plaintiff must still allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007). And "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). The plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 559. Nor does it suffice if the pleadings merely leave "open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." *Id.* at 561.

## IV. BACKGROUND[1]

This case has its genesis in the failure of Colonial Bank. On August 14, 2009, the State of Alabama Banking Department closed Colonial Bank and appointed the FDIC to act as receiver. (Doc. # 1 at ¶ 5.) On the same day, the FDIC marshaled Colonial Bank's assets and then entered into a Purchase and Assumption Agreement with BB&T. (Doc. # 8-1.) Meanwhile, the Alabama Department of Revenue (ADOR) sprung into action,

---

[1] The Court takes the following facts from the ADOR's complaint and the Purchase and Assumption Agreement between BB&T and the FDIC.

3

assessing a bevy of taxes owed to it by Colonial Bank and four of its affiliates—The Colonial BancGroup, Inc., CBG, Inc., CBG Investments, Inc., and CBG Nevada Holding Corp. (Doc. # 1 at ¶¶ 30, 42, 57, 76.) The assessments claimed that Colonial BancGroup and Colonial Bank's four subsidiaries owed taxes for the years 1998 to 2007 totaling $158,287,023.31.[2] (*Id.* at ¶ 13.)

Based on these assessments, the ADOR filed claims with the FDIC. (*Id.* at ¶ 10.) After much delay, the FDIC eventually disallowed the ADOR's claims, stating, "This claim has not been proven to the satisfaction of the Receiver." (*Id.* at ¶ 18.) The ADOR appealed this determination, seeking a fresh review of its claims in federal court. (*Id.* at ¶ 19.) It also joined BB&T in the action, asserting that "responsibility for the payment of the . . . tax assessments . . . rests with the FDIC and/or BB&T as successors and as receivers of the assets of Colonial Bank." (*Id.* at ¶ 33.)

## V. DISCUSSION

The parties agree that the disputed motion turns on a single legal question: did BB&T agree to assume excise taxes owed to the ADOR under its Purchase and Assumption Agreement with the FDIC? BB&T contends that it agreed to take on only certain liabilities—namely, those specifically described in § 2.1 of the Purchase and

---

[2] The ADOR claimed that CBG Investments, Inc. owed $81,748,364.39, which included the tax, penalty, and interest assessed for tax years 1999 through 2007. (Doc. # 1 at ¶ 32.) And it claimed that CBG, Inc. owed $48,073,984.23 for the same years. (Doc. # 1 at ¶ 44.) As for CBG Nevada Holding Corp., the ADOR alleged that it owed $15,754,138.01 for tax, penalty, and interest assessed for 2002 through 2007. (Doc. # 1 at ¶ 59.) Finally, it asserted that Colonial BancGroup, Inc. owed $12,757,095.33 for the taxes, penalties, and interest assessed against it from 2000 to 2007. When added together, the total is $158,333,581.63.

Assumption Agreement. The ADOR essentially agrees with BB&T on this point, but with the added caveat that § 2.1 included the tax obligations at issue here. After carefully considering the federal statutory scheme governing bank takeovers, Alabama law, and the Purchase and Assumption Agreement attached to the motion to dismiss, the Court finds that the ADOR failed to allege sufficient facts to state a legally cognizable claim against BB&T.

### A. The relevant law

### 1. The federal scheme for dealing with bank failures

Dealing with a bank failure usually requires a three-step process. First, either the authority that chartered the bank or the FDIC closes the failed institution and appoints a fiduciary. 12 U.S.C. § 1821(c)(3), (9). Typically the FDIC, like it did here, takes on that job by becoming the failed bank's receiver. Second, the fiduciary marshals the failed bank's assets by identifying all potentially valuable ownership interests held by the institution. Third, the fiduciary handles the outstanding claims against the failed bank. *See id.* § 1821(d)(2)(H).

Upon its appointment as receiver, the FDIC "steps into the shoes of the [failed bank] and operates as its successor." *In re Shirk*, 437 B.R. 592, 600 (S.D. Ohio 1992); *see also* 12 U.S.C. § 1821(d)(2)(A) ("the [FDIC] shall . . . by operation of law, succeed to—(i) all rights, titles, powers, and privileges of the insured depository institution . . . ."); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (stating that

FDIC "steps into the shoes" of failed savings and loan banks); *Gibson v. RTC*, 51 F.3d 1016, 1025 (11th Cir. 1195). As receiver, the FDIC can "transfer any asset or liability of the institution in default . . . without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. § 1821(d)(2)(G)(i)(II). The FDIC, therefore, can use this power to transfer an asset "while retaining a related liability" so that "no liability is transferred to an assuming institution . . . absent an express transfer." *Shirk*, 437 B.R. at 600; *see also* Jonathan R. Macey, Geoffrey P. Miller, & Richard Scott Carnell, *Banking Law & Regulation* 742 (3d ed. 2001) ("If some liabilities are excluded, then the acquirer will not assume them.").

The express terms of a purchase and assumption agreement hence govern whether an acquiring institution takes on a given liability to the failed institution's creditors. So a party entering into a purchase and assumption agreement with the FDIC assumes the failed bank's liabilities only to the extent called for in the contract. In other words, when the contract remains silent as to whether an acquirer has agreed to assume a given liability, the default rule is that it has not and that those liabilities remains with the FDIC. *See, e.g.*, *Payne v. Security Sav. & Loan Ass'n, F.A.*, 924 F.2d 109, 111 (7th Cir. 1991) (holding FDIC "is the successor to a failed thrift's liabilities unless [it] expressly designates otherwise"); *Kennedy v. Mainland Sav. Ass'n*, 41 F.3d 986, 990–91 (5th Cir. 1994) ("The federal receiver such as the FSLIC or RTC has the power to sell an asset . . . while retaining a related liability, and no liability is transferred to an assuming institution

6

such as Old Southwest absent an express transfer."); *Lawson v. Household Bank*, 20 F.3d 786, 788 (7th Cir. 1994) (stating the plaintiff's claims against successor bank had to be based on the P & A agreement between the RTC and the successor bank "under which the latter acquired certain deposits and assumed certain liabilities"). Otherwise, potential suitors would have to investigate thoroughly the extent of the liabilities on the failed bank's books, in turn making it more difficult for the FDIC to find an acquirer posthaste.[3] *See Vernon v. RTC*, 907 F.2d 1101, 1109 (11th Cir. 1990) ("very few, if any, banks would enter into purchase and assumption agreements with a federal receiver if the

---

[3] The speed and timing of these transactions is important. Typically, the FDIC takes over a failed bank at the close of business on Friday, enters into a purchase and assumption agreement with a suitor, and allows the solvent bank to take over operations by Monday. Using purchase and assumption agreements in this way has a number of advantages according to Professors Macey, Miller, and Carnell:

> First, it maximizes the going-concern value on both sides of the balance sheet: The acquirer picks up a deposit base, as in the case of insured deposit transfers, but also succeeds to a base of loan customers who are likely to return to the acquirer in the future for new financing. Second, by bundling the transfer of assets and liabilities, the purchase and assumption method saves on the costs of resolution. Third, the purchase and assumption transaction allows the failed institution to remain in operation, albeit in many cases under a different name, thus eliminating the danger that banking services will be disrupted and mitigating public concerns about bank failure. Fourth, purchase and assumption transactions remove some of the burden from the FDIC of collecting on the failed institution's assets. Finally, purchase and assumption transactions are sometime said to be superior because they can provide protection for *all* depositors, even those with deposits in excess of the [$250,000] insurance limit.

Jonathan R. Macey, Geoffrey P. Miller, & Richard Scott Carnell, *Banking Law & Regulation* 741 (3d ed. 2001). It is unclear whether a State can use last minute tax assessments to hinder this process in a way that undermines federal policy. Well-established precedent suggests a State cannot. *See M'Culloch v. Maryland*, 17 U.S. 316, 431 (1819) (barring Maryland from taxing corporation created by federal government because state taxation would undermine federal policy, stating, "the power to tax involves the power to destroy").

successor banks had to assume the latent claims of unknown magnitude of shareholders like appellants"); *FDIC v. Newhart*, 892 F.2d 47 (8th Cir. 1989) (stating essential element of purchase and assumption transaction is speedy evaluation by purchasing bank of failed bank's assets). Thus, the rule lessens the uncertainty surrounding an acquirer's newfound liabilities, furthering the policy of making acquirers more willing to enter into purchase and assumption agreements.

### 2. Alabama law governing tax liens

Alabama law authorizes tax liens. Equally important, it regulates their creation, validity, and priority over other claims. For starters, "unless another date is specifically fixed by law," a tax lien generally arises "at the time the . . . return . . . was due to have been filed with or made to the Department of Revenue." Ala. Code § 40-1-2(a). A tax lien lacks validity, however, as to a purchaser in the ordinary course of business—at least "until after the time a notice thereof has been filed by the Department of Revenue . . . in the office of the judge of probate of the county in which such property . . . is located." *Id.* § 40-1-2(b). The Alabama Code defines a purchaser as "[a] person who, for adequate and full consideration in money or money's worth, acquires an interest . . . in property which is valid against subsequent purchasers without actual notice." *Id.* § 40-29-22(g)(6).

When it comes to priority, a lien is invalid against purchasers until the Commissioner of Revenue perfects the State's claim by properly filing notice. Ala. Code § 40-29-22. For real property, perfection requires the State to file tax lien notices "in the

probate office of the county in which the property subject to the lien is situated." *Id.* § 40-29-22(f)(1)a. Perfecting a lien on personal property requires the State to file notice "in the office (i) in which a financing statement would be filed to perfect a security interest with respect to such property" under Alabama's version of the Uniform Commercial Code. *Id.* § 40-29-22(f)(1)b. And notice is only effective as to third parties "when properly included by name in the index of such financing statements available for public inspection." *Id.* 40-29-22(f)(1)b.

## B. Analysis

Courts interpret purchase and assumption agreements according to the contract's plain language. *Vernon v. RTC*, 907 F.2d 1101, 1109 (11th Cir. 1990). Section 2.1 of the agreement between the FDIC and BB&T states, in pertinent part:

> **2.1  Liabilities Assumed by Assuming Bank.** The Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"):
> . . .
> (b)  liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting any Assets, if any; *provided, that* the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;
> . . .

(Doc. # 8-1 at 8.)[4] This section does not, however, state that BB&T assumes liens that become valid after execution of the Purchase and Assumption Agreement. Quite to the contrary, the agreement says that BB&T agrees to assume only those liabilities in existence "as of Bank Closing." (*Id.*) And the agreement defines "Bank Closing" as "the date on which the Chartering Authority closed such institution." (*Id.* at 2.) By way of its definitions section, the Purchase and Assumption Agreement also excluded liabilities on assets held by entities other than Colonial Bank: the FDIC and BB&T defined "Assets" as "all assets of the Failed Bank," and the definition noted that "[a]ssets owned by Subsidiaries of the Failed Bank are not 'Assets.'" (*Id.* at 8.)

The ADOR fails to allege in its complaint that BB&T expressly assumed the tax liens it issue. Instead, it asserts claims against BB&T with the bare allegation that "the FDIC and/or BB&T" succeeded in Colonial Bank's liabilities. Federal law, however, makes clear that a bank that enters into a purchase and assumption agreement does *not* step into the failed bank's shoes. Rather, the FDIC does.[5] So allowing the ADOR to state a claim without alleging that BB&T expressly assumed the tax liens would contravene a

---

[4] As noted in the standard of review, a court typically keeps its motion to dismiss inquiry within the four corners of the complaint. But the Court may nonetheless consider documents outside of the complaint when the attached document is undisputed and central to the plaintiff's claims. *Speaker v. U.S. Dep't of Health & Human Servs.*, 623 F.3d 1371, 1379–80 (11th Cir. 2010). The Purchase and Assumption Agreement is such a document. *See Danilyuk v. JP Morgan Chase, N.A.*, No. 10-712-JLR, 2010 WL 2679843 (W.D. Wa. 2010) (taking judicial notice of purchase and assumption agreement on motion to dismiss); *Federici v. Monroy*, No. 09-4025-PVT, 2010 WL 1223192 (N.D. Cal. 2010) (same).

[5] The Alabama Department of Revenue recognizes this, stating in its complaint that, "As between BB&T and the FDIC, the FDIC assumed all liabilities relating to Colonial Bank and its subsidiaries as of August 14, 2009." (Doc. # 1 at ¶ 8.)

stated federal policy by turning every takeover of a failed bank into a de facto merger. *Compare* 12 U.S.C. § 1821(d)(2)(G)(i)(II) (allowing FDIC to transfer some assets without the attendant liabilities) *with* 12 U.S.C. § 1821(d)(2)(G)(i)(I) (allowing FDIC to complete a wholesale merger). Such a construction would make § 1821(d)(2)(G)(i)(II) irrelevant. Thus, the ADOR cannot state a legally cognizable claim against BB&T using the theory set forth in its complaint.

Still, the ADOR relies on the Purchase and Assumption agreement in its response brief, arguing that "if [its] claims for unpaid taxes are a 'lien on or affecting any Assets' of what was Colonial Bank or its subsidiaries, then that liability was specifically assumed by BB&T." (Doc. # 15 at 4.) Even putting aside for a moment ADOR's failure to allege liability under this theory, the Purchase and Assumption Agreement's definition section undermines this interpretation. In fact, the agreement *specifically* excludes liabilities attached to any "[a]ssets owned by Subsidiaries of the Failed Bank," which means any taxes assessed against CBG, Inc., CBG Investments, and CBG Nevada Holding Corp. *See* 12 U.S.C. § 1821(d)(2)(G)(i)(II); *In re Shirk*, 437 B.R. 592, 600 (S.D. Ohio 1992) (allowing FDIC to transfer asset while "retaining a related liability" so that "no liability is transferred to an assuming institution . . . absent an express transfer"). Similarly, the agreement refers to Colonial Bank, not BancGroup, Inc., as the "Failed Bank" throughout, thus implicitly excluding BancCorp Inc.'s tax liabilities when BB&T agreed to take on "the following liabilities of the Failed Bank." (Doc. # 8-1 at 8.)

The ADOR, moreover, simply assumes in its complaint that the process by which it filed its tax liens suffices to state a claim against BB&T. But the only allegations related to the filing, notice, and perfection process state that "BB&T and FDIC knew or should have known of the existence of the unpaid liabilities," (Doc. # 1 at ¶ 85), and that "[t]he statutory liens noted above were . . . perfected against certain persons when they were properly recorded on or about August 14, 2009." (Doc. # 1 at ¶ 86.) This does not suffice. The rule governing the creation of a valid lien and providing the process for gaining priority over purchasers requires more than knowledge or constructive knowledge. Indeed, Alabama law makes clear that the ADOR had to give notice by filing in the appropriate jurisdiction. *See* Ala. Code § 40-1-2(b) (providing for appropriate notice for validity against purchasers). Yet the ADOR failed to allege that it took these steps. Therefore, it failed to allege facts sufficient to support its claim that it had a valid lien.

The ADOR also failed to allege sufficient facts to claim that it perfected an interest in the assets bought by BB&T. As already noted, perfecting a tax lien as to a purchaser requires filing notice of the tax assessment in the correct office and jurisdiction. *See* Ala. Code §§ 40-29-22(f)(1)a (describing notice procedure for perfecting lien as against purchasers of real property), 40-29-22(f)(1)b (describing notice procedure for perfecting lien as against purchasers of personal property). Here, the ADOR only alleged that it perfected the "statutory liens *noted above*" (Doc. # 86 at ¶ 86

12

(emphasis added))—namely, the liens against Colonial BancGroup and Colonial Bank's four subsidiaries—which, as discussed above, were excluded liabilities under the Purchase and Assumption Agreement.[6]

## VI. CONCLUSION

The Alabama Department of Revenue failed to allege sufficient facts to establish that it had a valid lien at the time BB&T entered into the Purchase and Assumption Agreement with the FDIC. What is more, the ADOR's complaint lacked any facts suggesting that its tax liens, if valid, would have priority against a purchaser like BB&T. For these reasons, it is hereby ordered that the Motion to Dismiss (Doc. # 8) is GRANTED and the complaint against BB&T is DISMISSED without prejudice.

Done this the 17th day of January, 2012.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE

---

[6] Although the Court construes allegations in the light most favorable to the plaintiff, the ADOR's claim that it perfected the liens on August 14, 2009, in a single day runs into facial plausibility problems. First, the Court can take judicial notice that August 14, 2009, was a Saturday, *see Horne v. Potter*, 392 Fed. App'x 800, 802 (11th Cir. 2010) (allowing judicial notice of public records not subject to reasonable dispute on a motion to dismiss), which means the various probate and government offices for filing notice likely had their doors closed. Second, even if the ADOR gained access to the various courts and government buildings, it is unlikely that it could have filed notice in the various jurisdictions, some of which were located in other states. *See* Ala. Code 7-9A-301(1) (stating that law of jurisdiction of debtor governs where the ADOR should file and perfect a lien); (Doc. # 1 (alleging BancGroup created under Delaware law and claiming four subsidiaries created under Nevada law)). It is even more implausible that the various bureaucracies in Alabama, Delaware, and Nevada rapidly indexed the claims on August 14, 2009, so as to give BB&T one last shot to check the records before entering into its agreement with the FDIC. Because the liens at issue do not cover the assets bought by BB&T, however, the Court has not rested its decision on the facial implausibility of the perfection allegations and has instead taken them as true.